**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**THE OHIO STATE UNIVERSITY,**

      **Plaintiff,**

                             **Case No. 2:10-cv-753**
**v.**                        **JUDGE GREGORY L. FROST**
                             **Magistrate Judge E.A. Preston Deavers**

**KEITH ANTONIO THOMAS, et al.,**

      **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. # 4) and Defendants' Memorandum in Opposition (Doc. # 15). For the reasons set forth below, the Court **GRANTS** Plaintiff's motion.

**I. Background**

On August 20, 2010, Plaintiff the Ohio State University ("Ohio State") filed this action, claiming trademark infringement, unfair competition, and cyberpiracy in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* Ohio State named as defendants Keith Antonio Thomas and GDS Marketing, LLC ("Defendants").

Ohio State has several federally registered trademarks that it claims have been infringed:

1. "BUCKEYES" - registration number 1,152,683, registered April 28, 1981, to provide college sport exhibition events and recreation programs;

2. "BUCKEYES" - registration number 1,267,035, registered on February 14, 1984 for use on: toy stuffed animals, Christmas decorations, bean bags, plastic toys, foam toys and equipment sold as a unit for playing a stick ball game; clothing-namely, t-shirts, ties, scarves,

bibs, sweatshirts, athletic shorts, hats, aprons, jogging suits and sweaters; blankets, textile placemats, handkerchiefs, quilts and pennants; tumblers, cups, mugs, glasses and insulated beverage container holders; hassocks, bean bag leisure furniture, letter holding boxes, mirrors, and folding seats for use by individuals in athletic stadiums and plaques; tote bags; pens, posters, decals, and paintings; jewelry-namely, rings, pins, belt buckles and key chains, all being made of precious metal; electric lamps; providing college level educational programs, sport exhibition events and recreation programs;

3.  BUCKEYE DESIGN (a buckeye leaf) - registration number 2,437,954, registered January 2, 2001 for use on decals and stickers;

4.  "OHIO STATE" - registration number 1,294,114, registered September 11, 1984 for providing college level educational programs, sport exhibition events, recreation programs, toy stuffed animals, Christmas decorations, bean bags, plastic figurine toys, foam figurine toys, bats, balls and other equipment sold as a unit for playing a stick ball game, shoe laces, t-shirts, ties, scarves, bibs, sweatshirts, shorts, hats, aprons, jogging suits, sweaters, blankets, pennants, textile placemats, handkerchiefs, quilts, tumblers, cups, mugs, glasses, beverage container insulators, hassocks, bean bag leisure furniture, mirrors, and folding seats for use by individuals in athletic stadiums, tote bags, pens, posters, decals, paintings, letter holding boxes, rings, pins, belt buckles, key chains and electric lamps;

5.  "OHIO STATE" - registration number 1,152,682, registered April 28, 1981 for college sport exhibition events and recreation programs, dramatical and musical entertainment events and college level educational courses;

6.  "OSU" - registration number 1,121,595, registered July 3, 1979 for college sport

2

exhibition events and recreation programs, dramatical and musical entertainment events and college level educational courses;

7.  "OHIO STATE UNIVERSITY" - registration number 1,294,115, registered September 11, 1984 for jewelry-namely, rings, pins, belt buckles and key chains; pens, posters, decals, paintings, letter holding boxes; hassocks, bean bag leisure furniture, plaques, mirrors and folding seats for use by individuals in athletic stadiums; tumblers, cups, mugs, glasses and beverage container insulators; blankets, pennants, textile placemats, handkerchiefs and quilts; clothing-namely, t-shirts, ties, scarves, bibs, sweatshirts, shorts, hats, aprons, jogging suits and sweaters; toy stuffed animals, Christmas decorations, bean bags, plastic figurine toys, foam figurine toys, and equipment-namely, bats and balls sold as a unit for playing a stick ball game; and providing college level educational programs, sport exhibition events and recreation programs;

8.  "0" - registration number 2,689,612, registered February 25, 2003 for clothing, namely, jackets, sweaters, hats and t-shirts; and

9.  "O - Ohio State" (block-lettered "Ohio State" across the block letter "O") - registration number 2039181, registered February 18, 1997 for pens, game programs, and posters.  Ohio State refers to this as the "Athletic Logo."

Ohio State also alleges that Defendants are infringing on its common law trademarks. Ohio State claims that it has common law trademarks in the distinctive use of its school colors, scarlet and gray, in the appearance of its Official Website for college athletics, www.ohiostatebuckeyes.com, and the use of the block "O" with buckeye leaves.  The official website has been promoting Ohio State athletics since 1997.

The Court shall refer to all of these trademarks as "the Ohio State trademarks."

Defendants publish a website at www.buckeyeillustrated.com and publish two electronic magazines: "Buckeye Gameday" and "Ohio State Buckeyes E-Book."  Defendants are also currently in the process of printing over one hundred thousand copies of a football publication called "Buckeye Gameday," have published and sold advertising space within the "Buckeye Gameday" publication, on the website, and in the pages of the Ohio State Buckeyes E-Book. Ohio State argues that the website, the internet publications, and the print publication are each replete with infringing uses of Ohio State's exclusive trademarks.

Specifically, it is undisputed that the allegedly infringing website features the trademark "Buckeye" in the domain name and throughout the pages of the website, and contains many other uses of Ohio State trademarks including: the word "Buckeye" in large block letters similar to the font type used by Ohio State; the prominent use of Ohio State's school colors of scarlet and gray on the first page of the website, in the lettering of the words "Ohio State Buckeyes," and throughout the website and the electronic magazines; a logo depicting the words "Buckeye Illustrated.com" and the slogan "#1 Fan Site for Buckeye News and Information" also using Ohio State's school colors; a section of the website designated as "Buckeye News" for each athletics team covered on the website (basketball, track, football, hockey, soccer, volleyball, and wrestling), providing links to news stories relating to Ohio State athletics; the statement "At Buckeye Gamday (*sic*) we specialize in print and web media for Ohio State Buckeye men's and women's athletic programs"; a section of the website designated as the "Buckeye Gameday Fan Poll"; and number photographs depicting current and former Ohio State athletes in competition.

With regard to the allegedly infringing print publication, Defendants state on the

4

allegedly infringing website that "100,000+ Copies" of the publication will be printed and will be "Distributed to 100's of locations throughout the city of Columbus."  The allegedly infringing print publication, "Buckeye Gameday," employs the trademark "Buckeye" in its name and throughout the pages of the publication and contains a section titled "2010 Buckeye Football Season Preview"; a purported advertisement that states "Buckeye Football presented by Gatorade" printed over a photograph of Ohio State football player Terrell Pryor; a "Buckeye Football Schedule" that includes a watermark of the Athletic Logo; a "Buckeye Football Roster" and a section titled "Buckeye Football Stats"; and numerous photographs depicting current and former Ohio State athletes in competition.

With regard to the allegedly infringing electronic magazine called the "Ohio State Buckeyes E-Book," it employs the trademarks "Ohio State" and "Buckeye" in its name and contains numerous photographs depicting current and former Ohio State athletes in competition. The magazine contains the statement "Over 150,000 subscribers will receive the publication each week," and that "52 new editions that come with weekly updated content" will be published and distributed throughout the calendar year.  It also states that "Gameday is distributed at hundreds of locations throughout the Greater Columbus including: Ohio State Campus; Banks; Restaurants; Hotels; Convenient (*sic*) Stores; Sports Bars; Grocery Stores."

The allegedly infringing website contains advertisements from many local Columbus businesses such as the Buckeye Connection (a retail outlet that sells licensed Ohio State merchandise), Lindy's Restaurant, Mitchell's Steakhouse of Columbus, Quality Inn, and 5th Avenue Lumber.  The website also contains advertisements from many national companies such as Coca-Cola, Gatorade, BMW, Play it Again Sports, CheckSmart, and Best Buy.

On August 20, 2010, Ohio State filed a properly supported motion for a temporary restraining order and preliminary injunction.  (Docs. # 4, 5, 6, 7, 8, 11, 12.)  This Court held a telephonic conference pursuant to Local Rule 65.1.  *See* S.D. Ohio Civ. R. 65.1.  At that conference, all parties were represented and agreed to address Ohio State's motion via a telephonic conference with this Court on August 26, 2010.

At the August 26, 2010 hearing both Ohio State and Defendants were represented.  This Court accepted oral arguments on Ohio State's Motion for Temporary Restraining Order and Preliminary Injunction.

## II.  Standard

Rule 65 of the Federal Rules of Civil Procedure permits a party to a suit to seek injunctive relief if he believes he will suffer irreparable harm or injury.  The decision whether or not to issue a temporary restraining order or a preliminary injunction falls within sound discretion of the district court.  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  A temporary restraining order or a preliminary injunction are extraordinary remedies that should be granted only after the trial court has carefully considered the following four factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*), quoting *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)).  These four different considerations are not required elements of a conjunctive test but are rather factors to be balanced.  *In re Delorean*

*Motor Co.*, 755 F.2d at 1229; *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (no single factor is determinative.); *Monongahela Power Co. v. Schriber*, 322 F. Supp.2d 902, 918 (S.D. Ohio 2004) (same).

## III.  Discussion

Ohio State argues that it is entitled to a temporary restraining order and preliminary injunction against Defendants' use of Ohio State's registered and common law trademarks. Because the Court determines that Ohio State is entitled to a preliminary injunction based upon its claims for trademark infringement and unfair competition, the Court declines at this time to consider the merits of Ohio State's third claim for relief, cyberpiracy.

## A.  Likelihood of Success on the Merits - Infringement and Unfair Competition

Ohio State filed a claim for relief for trademark infringement pursuant to Section 32 of the Lanham Act, which provides:

> (1)Any person who shall, without the consent of the registrant--
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .
>
> (b) . . . shall be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1)(a), (b).

Ohio State also filed a claim for unfair competition pursuant to Section 43 of the Lanham Act, which provides:

> (a) Civil action.
>
> (1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or

any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

> (B) . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A), (B).

A claim for trademark infringement under § 1114 requires a showing of the following: (1) ownership of a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there is a likelihood of consumer confusion. *Too, Inc. v. TJX Cos.*, 229 F. Supp.2d 825, 829 (S.D. Ohio 2002).  Further, the foregoing standard is the same applied to a claim for unfair competition under § 1125. *Id.* (citing *Frisch's Rest., Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982)).  It is the likelihood of confusion that is the touchstone of both a claim for trademark infringement and for a claim of unfair competition under the Lanham Act. *Id.* (citing *Champions Golf Club*, 78 F.3d at 1121 ("As in an action alleging infringement of a mark, 'likelihood of confusion is the essence of an unfair competition claim.' ") (citation omitted)).  A defendant's good intentions do not in any way preclude a finding of likely confusion. *Champions Golf Club*, 78 F.3d at 1123.

In considering whether there is a "likelihood of confusion," a court examines the following eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Rest.*, 670 F.2d at 648.  The foregoing

factors " 'imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.' " *Abercrombie & Filch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp.2d 952, 959 (S.D. Ohio 2005) (quoting *PACCAR Inc. v. TeleScan Technologies, L. L. C.*, 319 F.3d 243, 249-50 (6th Cir.2003)).  The "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.' " *Champions Golf Club*, 78 F.3d at 1116 (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)).

### 1. Strength of the mark

The Sixth Circuit explains:

> The strength of a mark is a factual determination of the mark's distinctiveness.  The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due.  A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both.

*Daddy's Junky Music Stores Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (internal citations and quotation marks omitted).

First, the Court notes that Ohio State has federally registered trademarks on the terms "Buckeye," "Ohio State," "Ohio State University," "OSU," and on the block "O," the buckeye leaf, and the Athletic Logo, all of which are being utilized by Defendants on the allegedly infringing website and publications.  Therefore, Ohio State is entitled to all of the legal presumptions of exclusive right to use set out in 15 U.S.C. § 1114.  Further, Ohio State claims common law trademarks in the distinctive use of its school colors, scarlet and gray, adopted in 1878, in the appearance of its Official Website for college athletics, started in 1997, and the use

9

of the block "O," with buckeye leaves, relying on the continuous use of the block "O" since 1910.  All of these too are being used by Defendants in the allegedly infringing website and publications.

Next, the Court finds that all of the Ohio State trademarks used in connection with Ohio State athletics have received intensive advertisement.  Ohio State has provided a licensing program for more than 30 years.  That program has become the most profitable collegiate licensing program in the United States in the past five years, generating royalties of $35 million.  Ohio State currently has approximately 500 authorized licensees for products using the Ohio State trademarks.  Defendants are not one of Ohio State's licensees.

Defendants admit that the Ohio State trademarks are strong; however, they argue that a "simple search of the yellow pages" or the internet demonstrates that the word "Buckeye" does not carry the "strength as to direct individuals only the think of the university[.]"  (Doc. # 15 at 2.)  Defendants' argument, however, misses the mark.  Defendants do not use the word "Buckeye" to describe something unrelated to Ohio State athletics, but instead uses the word to in the domain name of a website, in the title of  electronic publications, and in the title of a print publication all exclusively related to Ohio State athletics.  The same is true of the other Ohio State trademarks at issue here.

Third, the Court finds that when used in connection with Ohio State athletics the term "Buckeye," as well as the other Ohio State trademarks used throughout the alleged infringing website and publications are readily accepted by the public as hallmarks of Ohio State athletics.

Accordingly, the Court concludes that the marks at issue here are quite strong in the context of a website or publication providing information exclusively related to Ohio State

athletics.

**2. Relatedness of the goods or services**

Cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties.  *Daddy's Junky Music Stores*, 109 F.3d at 282.  First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.  *Id.* (citing as an example *Champions Golf Club*, 78 F.3d at 1118).  Services and goods "are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."  *Id.* at 283 (citing *Homeowners Group*, 931 F.2d at 1109).  "The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?"  *Id.* (citations omitted).  "Similarly, courts must examine whether the products of the parties perform the same function, concentrating on 'whether consumers will be confused as to the origin of the product.' "  *Id.* (citing *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) ("*Wynn Oil I*") (holding that bulk car wax and complete car washing service of one party and car care products of other party offered consumers the fundamentally same thing: a clean car).

The facts here fit into the category of "competing directly" by offering the exact same goods or services–information and advertising about Ohio State athletics.  Therefore, "confusion is likely if the marks are sufficiently similar."  *Daddy's Junky Music Stores*, 109 F.3d at 282.

11

The marks here however are not only similar, but they are identical.  Further, Ohio State currently publishes game day programs for football, as well as numerous other sports programs and material containing athletics news, player information, team statistics, and schedules.  This is the exact information Defendants publish on their website, electronic publications, and anticipated printed publication.  Currently, Ohio State licenses its Ohio State trademarks to IMG, at a cost of over one million dollars, to publish athletic programs directed towards Ohio State fans; the same audience to whom Defendants direct their products.

Moreover, Defendants have sought and obtained advertising from the same advertisers as Ohio State athletic programs, such as Nike and Gatorade.  Indeed, Defendants' website actually links to Ohio State's official athletics site for certain news stories, giving the viewer a false sense of affiliation but also revealing the overlap in content between the two websites.  Finally, the allegedly infringing website and publications are replete with trademarked Ohio State terms and logos; scarlet and grey predominate; photographs of the Ohio State Football Stadium, Coach Tressel, the Ohio State athletics flag, and Ohio State athletes in their Ohio State uniforms predominate; and, the font used is the same block font used by Ohio State in its advertisements and information publications related to Ohio State athletics.

Defendants argue that they are a news source similar to, for example, the *Columbus Dispatch*.  The *Dispatch*, Defendants assert, reports on Ohio State athletics, utilizing pictures of the Ohio State trademarks without threat of infringement actions.  Defendants contend that the goods and services offered by them, like those offered by the *Dispatch*, are "quite dissimilar" to those offered by Ohio State.  As to the goods and services offered by Ohio State, Defendants assert that because the Ohio State University is an institution of higher learning, "its primary

product" is education.  Whereas Defendants and the *Dispatch* offer the news.  Defendants' arguments are not well taken.

First, the Court is unpersuaded by Defendants' argument that its services are analogous to a newspaper.  The allegedly infringing website and publications report exclusively on Ohio State athletics.  That type of product and service is not analogous to the *Columbus Dispatch*, which may or may not on any given day report on Ohio State athletics, and daily reports on a variety of news interests.

Second, Ohio State's "primary product" is not relevant to the inquiry at hand.  Ohio State does not claim infringement related to its educational products or services.  Ohio State claims infringement, unfair competition, and cyberpiracy against its products and services related to the use of its trademarks in association with its athletic programs.

The Court finds that the relatedness, or similarity, between materials either published or licensed by Ohio State and the alleged infringing website and publications of Defendants point to a high likelihood of confusion.  Consumers of the information contained on the alleged infringing website and in the alleged infringing publications are "likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by" Ohio State.  *Daddy's Junky Music Stores*, 109 F.3d at 283.  The information offered by Defendants are certainly likely to be connected to Ohio State "in the mind of a prospective" visitor to the website or reader of the publications.  *See id.*

### 3. Similarity of the marks

Similarity of marks is a factor of considerable weight.  *Daddy's Junky Music Stores*, 109 F.3d at 282 (citing *Champions Golf Club*, 78 F.3d at 1119).  Ohio State argues that the marks are

not just similar but that they are identical.  Defendants do not disagree that the marks at issue here are identical.  Instead, Defendants contend that "there are, frankly, only so many ways the term [Buckeye] can look in all caps."  (Doc. # 15 at 4.)  This Court agrees.  That is why when a company wants to make use of the trademarked term in connection with a website or print publication exclusively related to Ohio State athletics it must obtain a license.

Defendants have used both actual marks of Ohio State and styled their publications to appear like licensed or original Ohio State materials.  The Court finds that this factor weighs heavily in favor of the likelihood of confusion.

### 4.  Evidence of actual confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."  *Daddy's Junky Music Stores*, 109 F.3d at 284 (citing *Wynn Oil I*, 839 F.2d at 1188). "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion 'is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.' " *Id. (*citing *Wynn Oil I*, 839 F.2d at 1188) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed. Cir. 1984)).

Ohio State admits that it does not, at this time, have any evidence of actual confusion. The Court, however, agrees with Ohio State's assertion that there has been no opportunity for it to engage in a search for this type of evidence, just becoming aware of Defendants' website and publications within the last few weeks.  *Cf. Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (less weight given when "there has been no real opportunity for actual confusion").

14

### 5.  Marketing channels used

The fifth factor in the trademark infringement and unfair competition analysis requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services.  *Daddy's Junky Music Stores*, 109 F.3d at 285 (citing *Homeowners Group*, 931 F.2d at 1110).  Further, a court must determine whether the marketing approaches employed by each party resemble each other.  *Id.* (citing *Homeowners Group*, 931 F.2d at 1110).

Here, Ohio State, its licensees, and Defendants all use the same marketing channels to distribute their respective publications.  Defendants admit that they intend to offer their print publications in and around the Ohio State University.  The fact that Defendants' "Buckeye Gameday" is intended to be free of cost does not take away from the fact that the marketing approaches employed by them and Ohio State resemble each other.  Defendants have sought and obtained advertisement from Columbus businesses and national businesses that are potential or actual business partners with Ohio State.  Defendants and Ohio State direct the publication to the same demographic and distribute (or plan to distribute) in the same geographic area.

Further, Defendants make use of the same Internet channels used by Ohio State. " '[S]imultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion,' given the fact that "entering a web site takes little effort -- usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.' "  *Audi AG v. D'Amato*, 469 F.3d 534, 544 (6th Cir. 2006) (citing *PACCAR*, 319 F.3d at 252).

Thus, the Court concludes that the similarities between the predominant customers of the parties' respective goods and services and the similar marketing approaches employed by them are likely to lead consumers to believe that Defendants and Ohio State "are affiliated in some way." *Homeowners Group*, 931 F.2d at 1107.

### 6. Likely degree of purchaser care

The degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion.

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners Group*, 931 F.2d at 1111. For example, home buyers will display a high degree of care when selecting their real estate brokers, *see id.*, whereas consumers of fast-food are unlikely to employ much care during their purchases. *See Little Caesar*, 834 F.2d at 572.

In the case *sub judice*, Defendants' website and publications are free. The commercial benefit realized by Defendants is in the advertising revenue obtained via the mass circulation of the allegedly infringing publications and the consumer visits to the allegedly infringing website. The Court concludes that consumers here will not exercise a high degree of care when viewing Defendants' products. The cost of the product is not merely low, but it is free. Moreover, the Internet consumers are especially unlikely to make significant efforts or to take care in ascertaining the true source of the material they view, particularly when both the domain name and the website itself display Ohio State's name and trademarks associated with Ohio State

16

athletics. *See Audi AG*, 469 F.3d at 544 ("Internet users do not undergo a highly sophisticated analysis when searching for domain names.").

### 7. Intent of the defendant in selecting the mark

Intent is relevant because purposeful copying indicates that the alleged infringer, who has "at least as much" knowledge "as the trier of fact" regarding the likelihood of confusion, believes that his copying may divert some business from the senior user. *Little Caesar*, 834 F.2d at 572. Direct evidence of intentional copying is not necessary to prove intent. *See Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595,603 (6th Cir. 1991) ("*Wynn Oil II*"). Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. *See id.* A defendant's intentional copying of a senior user's mark however creates a presumption of likelihood of confusion. *Ferrari s.p.a. Esercizio Fabriche Automobili D. Corse v. Roberts*, 944 F.2d 1235, 1243 (6th Cir. 1991).

Defendants argue that the intent behind the choice of domain name of the allegedly infringing website and the names of the allegedly infringing publications "stem[] not from a desire to mislead or steal customers or even advertisers away from the Ohio State University's athletic web site," but instead stem "from a desire to simply identify what the website or magazine focuses on: news about Ohio State athletics." (Doc. # 5 at 5.) Defendants conclude that because of this, their use is a "fair use." This Court disagrees.

The Sixth Circuit explains:

A defendant may raise the affirmative defense of fair use by establishing that:

> the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used

17

> fairly and in good faith only to describe the goods or services of such
> party, or their geographic origin.

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 612 (6th Cir. 2009) (quoting 15 U.S.C. §

1115(b)(4) and citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111,

118-22 (2004) and *Audi AG*, 469 F.3d at 547).

The problem for Defendants, and the reason why this defense is unavailable to them, is

that the terms and logos they have chosen to use are not being used "otherwise than as a mark."

The fair use affirmative defense only permits others to use a protected mark to describe aspects

of their own goods, provided the use is in good faith and not as a mark. For example, in *ETW*

*Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920-21 (6th Cir. 2003), the court held that an artist's use

of Tiger Woods's name on the back of the envelope containing the artist's print and in the

narrative description of the print was "purely descriptive," and that there was "nothing to

indicate that [it was] used other than in good faith." Woods's name, the court noted, was used

only to describe the content of the print, and all of the materials accompanying the print clearly

identified the artist himself as the source of the print. *Id.* In the instant action, however, the

marks at issue are not used in the descriptive sense, but instead are used as marks.

Accordingly, the Court finds that Defendants intentionally copied Ohio State's

trademarks intending to capitalize on the commercial value of Ohio State's reputation and good

will.

### 8. Likelihood of expansion of the product lines

"[A] 'strong possibility' that either party will expand his business to compete with the

other or be marketed to the same consumers will weigh in favor of finding that the present use is

infringing." *Homeowners Group*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) &

18

comment c (1938)).  "[A]s with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary."  *Champions Golf Club*, 78 F.3d at 1122 (emphasis in original).

In this case, Defendants are poised to expand the market and distribution channels for their products.  Both the "Ohio State Buckeyes E-Book" and the "Buckeye Gameday" indicate that Defendants will distribute thousands of hard copies of the publication "Buckeye Gameday" in the Columbus area, and the "Ohio State Buckeye E-Book" also indicates that "subscribers will receive the publication each week" with new content over the course of the year.  Such expansion will undoubtably enlarge the breadth of the competition between Ohio State and Defendants and further illustrates the likelihood that confusion among consumers will be compounded over time to Ohio State's detriment.

**9.  Conclusion of the likelihood of success on the merits**

As set out above, seven of the eight factors indicate that Defendants' allegedly infringing website and publications are highly likely to result in consumer confusion.  Defendants have argued, with regard to the website, that any proof of consumer confusion is rebutted by a disclaimer at the bottom of the landing page on the website that states: "This website is an unofficial and independently operated source of news and information not affiliated with any school or team."

The Sixth Circuit has specifically stated that "such a disclaimer does not absolve [the defendant] of liability for his unlawful use of marks identical to [the plaintiff]'s trademarks." *Audi AG*, 469 F.3d at 546 (citing *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665,

19

673-74 (E.D. Mich. 2002) ("The principle that disclaimers are often ineffective is especially applicable when the infringer uses an exact replica of the relevant trademark.")). The *Audi AG* court went on to explain:

> In addition, as we stated in *PACCAR*,
>
>> [a]n infringing domain name has the potential to misdirect consumers as they search for web sites associated with the owner of a trademark. A disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching the web site comes too late. This "initial interest confusion" is recognized as an infringement under the Lanham Act.
>
> *PACCAR*, 319 F.3d at 253.

*Id.* For these same reasons, this Court finds that Defendants' disclaimer does not absolve Defendants of liability here.

Consequently, the Court concludes that Ohio State has demonstrated a strong likelihood that it will succeed on the merits of its claims of trademark infringement and unfair competition.

## B. Irreparable Injury

Once a moving party has demonstrated a likelihood of confusion, a finding of irreparable injury ordinarily follows. *Wynn Oil II*, 943 F.2d at 608. Ohio State has already demonstrated that there is a high likelihood that consumers will associate Defendants' website and publications with Ohio State. Moreover, given a trademark's unique role in protecting intangible assets, such as reputation and goodwill, injuries that arise as a result of trademark infringement and public confusion "are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). *See also Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1434 (S.D. Ohio 1989) ("Trademark infringement by nature is generally

20

irreparable and the showing of a high probability of confusion almost invariably gives rise to irreparable harm."); *Dominic's Rest. of Dayton, Inc. v. Mantia*, 2009 U.S. Dist. LEXIS 37215, *36 (S.D. Ohio April 20, 2009) (same).   The *Processed Plastic* court went on to observe:

> The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." quoting 4 R. Calmann "Unfair Competition, Trademarks and Monopolies," section 88.3(b) at 205 (3rd ed. 1970).

*Id.*

The Court concludes Ohio State will suffer irreparable harm if Defendants continue to publish and disseminate their products because they improperly trade on the goodwill and reputation of Ohio State.  Accordingly, this element of the preliminary injunction standard also favors Ohio State.

## C.  Harm to Others

The third factor that the Court must consider is whether issuance of the requested injunction will cause substantial harm.

> In a trademark case, if the movant can show a likelihood of success, then the harm to others caused by an injunction will likely consist in part of the non-movant's lost profits from sales of the apparently infringing articles and a loss of the money expended on promotional materials and advertising.  Such harm caused to apparent infringers, however, is not entitled to consideration in assessing the harm caused by an injunction.  *See Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1435 (S.D. Ohio 1989).

*Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990).

"A party who willfully proceeds to expend funds on infringing activities cannot claim the loss of those funds as a ground for denying preliminary injunctive relief." *Central Benefits Mutual Ins. Co.*, 711 F. Supp. at 1435.  "Accordingly, if the plaintiff alleging trademark

infringement can show a likelihood of success, the 'harm to others' factor of the preliminary injunction standard would normally favor the plaintiff as well." *Worthington Foods*, 732 F. Supp. at 1462.

The Court finds that this is the normal situation where, because Ohio State has shown a strong likelihood of success on the merits, the harm to others element also favors Ohio State. Defendants cannot claim a loss of profits on their infringing activities as harm. Thus, the balance of harms favors granting Ohio State's motion for emergency injunctive relief.

**D.  Public Interest**

The Court concludes that the public interest favors issuing a preliminary injunction. In trademark cases, public policy concerns may weigh in favor of preliminary injunctive relief because an injunction would halt confusion in the marketplace. *See Worthington Foods*, 732, F. Supp. at 1463. *See also P&G v. Georgia-Pacific Consumer Prods. LP*, No. 1:09-cv-318, 2009 U.S. Dist. LEXIS 72052, at *30 (S.D. Ohio August 3, 2009) ("Absent a likelihood of confusion, it is not within the public interest to grant an injunction at this time."). Further, the Court finds persuasive Ohio State's argument that the Ohio State University is a public institution, funded by the public who has an interest in ensuring that is marks are used properly and under the quality control of Ohio State, thereby ensuring that Ohio State can maximize its own revenue associated with the use of its name, reputation, goodwill, and intellectual property.

Accordingly, the public interest also weighs in favor of issuance of the requested injunction.

**E.  Conclusion - Injunctive Relief**

As set forth above, all four factors in the injunctive relief analysis weigh in favor of

granting Ohio State's request for emergency injunctive relief. The Court determines that Ohio State's request for a combined temporary restraining order and preliminary injunction has merit. The Court does not find it necessary, nor have Defendants requested the opportunity, to engage in expedited discovery to prepare for a second injunctive relief hearing. Moreover, there is nothing before the Court to indicate that discovery can produce any evidence that could possibly affect the Court's conclusions related to the injunctive relief analysis. Therefore, a second injunctive relief hearing is unnecessary.

**F. Bond**

This Court must determine whether a bond is appropriate in this case. It is within the sound discretion of the trial court to set the amount of a bond or set a nominal bond under Rule 65 of the Federal Rules of Civil Procedure. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (explaining that while a district court must consider whether security is appropriate, the decision is left to the sound discretion of the court); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171,1176 (6th Cir. 1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

Here, based on the fact that all four factors in the preliminary injunction analysis favor Ohio State and Ohio State would certainly able to pay any potential damages awarded against it, the Court finds that no bond is required.

### IV. Conclusion

Based on the foregoing, the Court **GRANTS** Plaintiff's Motion for a Temporary

Restraining Order and a Preliminary Injunction.  (Doc. # 4.)

## V.  Temporary Restraining Order and Preliminary Injunction

**IT IS HEREBY ORDERED** that Defendants and their agents, servants, employees, successors, representatives and assigns, and all others in active concert and privity with them who receive actual notice of this Temporary Restraining Order and Preliminary Injunction by personal service or otherwise, are enjoined from:

1.  Using the Ohio State trademarks, as defined in the amended complaint and described in this decision, in commerce in any way.

2.  Using, registering, selling, transferring or assigning any domain name that contains any of the Ohio State trademarks.

3.  Using the Ohio State trademarks in connection with a website or as metatags, directory names, other computer addresses, invisible data, or otherwise engaging in acts or conduct that would cause confusion as to the source, sponsorship or affiliation of Ohio State with Defendants.

4.  Using the Ohio State trademarks in connection with any printed publication.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order and Preliminary Injunction shall become effective upon entry of this Opinion and Order.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order and Preliminary Injunction shall remain in effect pending disposition of this action on the merits.

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**